# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND and )
LABORERS' WELFARE FUND OF THE )
HEALTH AND WELFARE DEPARTMENT )
OF THE CONSTRUCTION AND GENERAL )
LABORERS' DISTRICT COUNCIL OF )
CHICAGO AND VICINITY, and JAMES S. )
JORGENSEN, Administrator of the Funds, )
)
               Plaintiffs, )    **Case No. 05 C 7108**
    v. )
)    **Judge FILIP**
SCIORTINO BROTHERS INC., a dissolved )
Illinois Corporation, and PHILIP S. )
SCIORTINO, individually, )
)
               Defendants. )

## MOTION FOR ENTRY OF JUDGMENT IN SUM CERTAIN

Now come Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health

and Welfare Department of the Construction and General Laborers' District Council of Chicago

and Vicinity (hereinafter, the "Funds") and James S. Jorgensen ("Jorgensen"), by and through

their attorney, Amy N. Carollo, and hereby move for an Entry of Judgment in Sum Certain

against Defendants Sciortino Brothers, Inc. (hereinafter the "Company") and Phillip S. Sciortino

(hereinafter "Sciortino"), individually. In support of this Motion, Plaintiffs state as follows:

    1.    Plaintiffs filed their First Amended Complaint on April 5, 2006 seeking to compel

the Defendants to submit current benefit and union dues reports and contributions from the

period of June 2004 forward, to submit delinquent contributions and dues for the audit period of

August 16, 2002 through May 31, 2004, and to obtain and maintain a surety bond.

2. Defendants filed a Motion to Dismiss on July 10, 2006, which was later denied by the Court. See Docs. 26 and 33. Defendants filed their Answer to Plaintiffs' First Amended Complaint on September 15, 2006. See Doc. 31.

3. Subsequent to the filing of the First Amended Complaint, Defendants submitted to audits for the periods of August 16, 2002 through May 31, 2004 and June 1, 2004 through September 20, 2006.

4. As set forth in the Affidavit of Joe Gilleran filed contemporaneously herewith and attached hereto as Exhibit A, pursuant to the Agreement, the Funds' respective Agreements and Declarations of Trust, the Funds are entitled to $233,934.86 in delinquent contributions, liquidated damages, and interest on the audits conducted for the periods of August 16, 2002 through May 31, 2004 and June 1, 2004 through September 20, 2006, as to Defendant Sciortino Brothers, Inc. Exhibit A, ¶ ¶ 1 through 8.

5. Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, the Agreement, and the Funds' respective Agreements and Declarations of Trust, the Funds are entitled to judgment in the amount of $233,934.86 against Defendant Sciortino Brothers, Inc., as follows:

    a.    $70,022.72 in unpaid contributions and dues, interest, and liquidated damages due on the audit covering contributions due for the period of August 16, 2002 through May 31, 2004. See Exhibit A, ¶ 6.

b. $163,912.14 in unpaid contributions and dues, interest, and liquidated damages due on the audit covering contributions due for the period of June 1, 2004 through September 20, 2006. See Exhibit A, ¶ 7.

6. Sciortino is and was, at all times relevant, President of the Company. See Docs. 18 and 31. The Company was involuntarily dissolved by the Illinois Secretary of State for the following periods of time: May 7, 2003 through February 13, 2004; December 1, 2004 through March 3, 2005; and December 1, 2005 through April 20, 2006. See Certificates of Dissolution and Applications for Reinstatement from the Illinois Secretary of State attached hereto as Exhibit B.

7. Sciortino operated the Company during periods of its dissolution. Accordingly, Sciortino is jointly and severally liable for debts of the Company incurred during the afore-mentioned periods of dissolution, including benefit contributions and dues. See Doc. 33 and 805 ILCS 5/8.65(a)(3).

8. As set forth in the Declaration of Christina Krivanek filed contemporaneously herewith and attached hereto as Exhibit C and pursuant to the Agreement the Funds' respective Agreements and Declarations of Trust, and 805 ILCS 5/8.65(a)(3), the Funds are entitled to delinquent contributions, liquidated damages, audit costs, and interest on the audits conducted for the periods of August 16, 2002 through May 31, 2004 and June 1, 2004 through September 20, 2006, as to both Defendants, joint and severally. Exhibit A ¶ ¶ 1 through 8; Exhibit C, ¶ ¶ 1 through 3.

9. Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management

3

Relations Act ("LMRA"), as amended, 29 U.S.C. §185, 805 ILCS 5/8.65(a)(3), the Agreement, and the Funds' respective Agreements and Declarations of Trust, the Funds are entitled to judgment in the amount of $38,809.80 against Defendants Sciortino Brothers, Inc., and Philip S. Sciortino, joint and severally, as follows:

a.   $7,175.13 in unpaid contributions and dues, interest, liquidated damages, and audit costs due on the audit covering contributions due for the period of August 16, 2002 through May 31, 2004. See Exhibit C, ¶ 2.

b.   $20,624.17 in unpaid contributions and dues, interest, liquidated damages, and audit costs due on the audit covering contributions due for the period of June 1, 2004 through September 20, 2006. See Exhibit C ¶ 3.

c.   As set forth in the Fee Declaration of Christina Krivanek filed contemporaneously herewith and attached hereto as Exhibit D, $11,010.50 in attorneys' fees and costs expended in this matter.

WHEREFORE, Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendant Sciortino Brothers, Inc., in the amount of $233,934.86 as follows:

A.  For $70,022.72 representing unpaid contributions and dues, interest, and liquidated damages due on the audit covering contributions due for the period of August 16, 2002 through May 31, 2004;

B.  For $163,912.14 representing unpaid contributions and dues, interest, and liquidated damages due on the audit covering contributions due for the period of June 1, 2004 through September 20, 2006; and

C.  Ordering Defendant to pay post judgment interest on all amounts due from the date of judgment until the judgment is satisfied.

and that Plaintiffs respectfully request that judgment be entered in Plaintiffs' favor and against Defendants Sciortino Brothers, Inc., and Phillip S. Sciortino, joint and severally, in the amount of $38,809.80 as follows:

D.  For $7,175.13 representing unpaid contributions and dues, interest, liquidated damages, and audit costs due on the audit covering contributions due for the period of August 16, 2002 through May 31, 2004;

E.  For $20,624.17 representing unpaid contributions and dues, interest, liquidated damages, and audit costs due on the audit covering contributions due for the period of June 1, 2004 through September 20, 2006

F.  For $11,010.50 representing attorneys' fees and costs; and

G.  Ordering Defendants to pay post judgment interest on all amounts due from the date of judgment until the judgment is satisfied.

5

May 1, 2007

Respectfully submitted,

Laborers' Pension Fund, et al.

By: /s/ Christina Krivanek

Patrick T. Wallace
Jerrod Olszewski
Christina Krivanek
Amy N. Carollo
Laborers' Pension and Welfare Funds
Sub Office, 53 W. Jackson Blvd., Suite 550
Chicago, IL  60604
(312) 692-1540

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LABORERS' PENSION FUND, et al.,    )
         )
        **Plaintiffs,**    )    **Case No. 05 C 7108**
    **v.**    )
         )    **Judge FILIP**
SCIORTINO BROTHERS INC., a dissolved    )
Illinois Corporation, and PHILIP S.    )
SCIORTINO, individually,    )
         )
        **Defendants.**    )

## AFFIDAVIT OF JOE GILLERAN

JOE GILLERAN, being first duly sworn on oath, deposes and states as follows:

1.    I am a Field Representative employed by the Laborers' Pension Fund and the Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago and Vicinity (hereinafter collectively referred to as the "Funds"), Plaintiffs in the above-referenced action. My responsibilities include oversight of the collection of amounts owed by Defendant Sciortino Brothers, Inc. (hereinafter referred to as the "Company"). This Affidavit is submitted in support of the Laborers' Funds' Motion for Entry of Judgment in Sum Certain. I have personal knowledge regarding the statements contained herein.

2.    On August 16, 2002, the Company signed an Independent Construction Industry Collective Bargaining Agreement ("Memorandum") with the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") and Laborers' Local Union No. 6. A true and accurate copy of the Memorandum is attached hereto as Exhibit A-1. Pursuant to the terms of the Memorandum, the Company is bound

1



to the terms of the relevant collective bargaining agreements incorporated by reference in the Memorandum ("Agreement(s)") and the Funds' respective Agreements and Declarations of Trust.

3.    Pursuant to agreement, the Funds have been duly authorized to act as collection agents on behalf of the District Council for union dues owed to the District Council.

4.    The Agreement and the Funds' respective Agreements and Declarations of Trust to which the Company is bound require that the Company submit benefit reports and contribution payments by the tenth day of the following month. Payments which are not received within thirty days of this date are assessed liquidated damages in the amount of 10 per cent of the principal amount of delinquent contributions, and interest at a rate of prime plus 2 per cent as charged by the First National Bank of Chicago from the date of delinquency forward. The Agreement and the Funds' respective Agreements and Declarations of Trust also obligate the Company to submit its books and records to the Funds for periodic audits to determine benefit contribution compliance. A copy of the relevant portions of the Agreement are attached as Exhibit A-2; a copy of the relevant portions of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund are attached as Exhibit A-3; and a copy of the relevant portions of the Amended Health and Welfare Department of the Construction and General Laborers' District Council are attached as Exhibit A-4.

5.    The Agreement to which the Company is bound requires the Company to obtain and maintain a surety bond to insure the payment of future wages, pension and welfare contributions. The Company has failed to obtain and maintain a surety bond.

6.    An audit of the Company's books and records was conducted for the period of August 16, 2002 through May 31, 2004, which revealed that the Company owed the following amounts of unpaid benefit contributions, union dues, liquidated damages, and interest:

| | |
|---|---|
| Welfare Fund | $23,100.82 |
| 10% Liquidated Damages | $2,310.08 |
| Pension Fund | $18,854.96 |
| 10% Liquidated Damages | $1,885.50 |
| Training Fund | $987.79 |
| 10% Liquidated Damages | $98.78 |
| Dues | $2,637.11 |
| 10% Liquidated Damages | $263.71 |
| LDCLMCC | $697.26 |
| 10% Liquidated Damages | $69.73 |
| CCA | $406.74 |
| 10% Liquidated Damages | $40.67 |
| LECET | $348.63 |
| 10% Liquidated Damages | $34.86 |
| Interest (all Funds) | $18,286.08 |
| Audit Costs | $960.00 |
| | |
| TOTAL | $70,982.72 |

A true and accurate copy of the audit is attached hereto as Exhibit A-5. A true and accurate copy of my audit summary sheet calculating liquidated damages and interest is attached hereto as Exhibit A-6.

7.     An audit of the Company's books and records was conducted for the period of August 16, 2002 through May 31, 2004, which revealed that the Company owed the following amounts of unpaid benefit contributions, union dues, liquidated damages, and interest:

| | |
|---|---|
| Welfare Fund | $71,778.41 |
| 10% Liquidated Damages | $7,177.84 |
| Pension Fund | $39,525.79 |
| 10% Liquidated Damages | $3,952.58 |
| Training Fund | $1,904.60 |
| 10% Liquidated Damages | $190.46 |
| Dues | $6,632.85 |
| 10% Liquidated Damages | $663.29 |
| LDCLMCC | $1,344.42 |
| 10% Liquidated Damages | $134.44 |
| CCA | $896.28 |
| 10% Liquidated Damages | $89.63 |
| LECET | $560.18 |
| 10% Liquidated Damages | $56.02 |
| Interest (all Funds) | $29,005.35 |
| Audit Costs | $1,193.78 |

TOTAL                             $165,105.92

A true and accurate copy of the audit is attached hereto as Exhibit B-7. A true and accurate copy of my revised audit summary sheet calculating liquidated damages and interest is attached hereto as Exhibit A-8.

8.       The Agreement to which the Company is bound requires the Company to obtain and maintain a surety bond to insure the payment of future wages, pension and welfare contributions. The Company has failed to obtain a surety bond.

FURTHER AFFIANT SAYETH NAUGHT.

Joe Gilleran

Subscribed and sworn to before me

this 30th day of April, 2007.

Notary Public

**"OFFICIAL SEAL"**
Susan M. Diforti
Notary Public, State of Illinois
My Commission Expires Oct. 5, 2008



# CONSTRUCTION & GENERAL LABORERS'
## DISTRICT COUNCIL OF CHICAGO AND VICINITY
### AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO
101 BURR RIDGE PARKWAY • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630/655-8289 • FAX: 630/655-8853

## INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between **SCIORTINO BROS INC** ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1006, 1035, 1092, together with any other Local Unions that may come in, within the Union's jurisdiction ("Local Union"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1. **Recognition.** The Employer, in response to the Union's request for recognition as the majority 9(a) representative of its Laborer employees, and the Union's offer to show evidence of its majority support, hereby recognizes the Union under Section 9(a) of the Act as the sole and exclusive collective bargaining representative for the employees now and hereinafter employed in the Laborer bargaining unit with respect to wages, hours and other terms and conditions of employment without the need for a Board certified election. The Employer has not assigned its rights for purposes of collective bargaining with the Union to any person, entity or association, and hereby revokes its prior assignment of bargaining rights, if any. The Employer further voluntarily elects not to assign such bargaining rights to any person, entity or association during the term of this Agreement or any extension thereof, without written approval from the Union. The Employer shall abide by this Agreement, and extensions hereof, provided that it employs at least one Laborer per year.

2. **Labor Contract.** The Employer affirms and adopts the applicable Collective Bargaining Agreements, as designated by the Union, between the Union and the Builders' Association of Chicago and Vicinity, the Illinois Road Builders Association, the Underground Contractors Association, the Mason Contractors Association of Greater Chicago, the Concrete Contractors Association of Greater Chicago, G.D.C.N.I/C.A.W.C.C., the Chicago Demolition Contractors' Association, the Illinois Environmental Contractors Association, the Lake County Contractors Association, the Contractors Association of Will and Grundy Counties, the Fox Valley General Contractors Association, the Chicago Area Rail Contractors Association, the Chicago Scaffolding Association, and all other employer associations with whom the Union or its affiliated Local Unions has an agreement. If the applicable collective bargaining agreement(s) expire during the term of this Agreement, any limitation on the right to strike shall also expire until a new Agreement has been established, which shall be incorporated retroactively herein. It is further agreed that where the Employer works within the geographic jurisdiction of the Union's affiliated Local Unions that have negotiated an association agreement effective within the Local Union's jurisdiction, then the Local Union agreement is herein specifically incorporated into this Agreement and shall supersede the area-wide standard association agreements within the locality for which it is negotiated in the case of any conflict between them. Notwithstanding the foregoing, this Agreement supersedes all contrary terms in either the Local Union or area-wide association agreements.

3. **Dues Checkoff.** The Employer shall deduct from the wages of employees uniform working dues in the amount of 1.5% of gross wages, or such other amount as directed by the Union, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made. It is the parties' intention that these deductions comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and such deductions be made only pursuant to written assignments from each employee on whose account such deductions are made, which shall not be irrevocable for a period of more than one year or beyond the termination date of the labor agreement, whichever occurs sooner.

4. **Work Jurisdiction.** This Agreement covers all work within the Union's work jurisdiction as set forth in the Union's Statement of Jurisdiction, receipt of which is hereby acknowledged, and as amended by the Union from time to time. The Statement of Jurisdiction is incorporated by reference into this Agreement. The Employer shall assign all work described therein to its Union-represented Laborer employees and acknowledges the appropriateness of this assignment. Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except upon written notice by and direction of the Union. The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work and coming within the above-described jurisdiction of the Union to any person, corporation or entity not stipulated to and covered by a collective bargaining agreement with the Union. This obligation applies to all tiers of subcontractors performing work at the site of construction. When the Employer contracts out or sublets any of the work coming within the above-described jurisdiction of the Union, it shall assume the obligations of any such subcontractor for prompt payment of employees' wages and other benefits required under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

5. **Fringe Benefits.** The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of The Construction and General Laborers' District Council of Chicago and Vicinity, the Construction and General Laborers' District Council of Chicago and Vicinity Pension Fund (including Laborers' Excess Benefit Fund), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust ("LECET"), and to all other designated Union-affiliated benefit and labor-management funds, and to become bound by and be considered a party to the Agreements and Declarations of Trust creating said Trust Funds as if it had signed the original copies of the Trust instruments and amendments thereto. The Employer ratifies and confirms the appointment of the Employer Trustees who shall, together with their successor Trustees, carry out the terms and conditions of the Trust instruments. The Employer further affirms that all prior contributions paid to the Welfare, Pension and Training Funds were made by duly authorized agents of the Employer at all proper rates, and evidence the Employer's intent to be bound by the Trust Agreements and Collective Bargaining Agreements in effect when the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable agreements. Upon written notice to the Employer, the Union may increase the minimum surety bond to an amount not exceeding one hundred thousand dollars where necessary to assure Employer compliance with its obligations.

Where Laborers covered by this Agreement perform work outside the Chicago area, the Employer shall, if covered under a local LIUNA-affiliated labor agreement in the area, contribute to the local fringe benefit funds in the amounts set forth in the local agreement. Otherwise, it shall remit all fringe benefit fund contributions in the amounts and to the funds as required under this Agreement.

6. **Wages and Industry Funds.** The Employer shall pay all the negotiated hourly wages, fringe benefit and industry fund contributions it is bound to pay under the applicable Collective Bargaining Agreements, including, where applicable, contributions to the Chicago-Area LECET and designated labor-management and industry advancement funds, except that no contributions shall be made to MCIAF unless consented to and upon written direction from the Union. All additional wage rates, dues checkoff, and fringe benefits that are negotiated or become effective after May 31, 2001 shall be incorporated into this Agreement. The Union expressly reserves its sole right to allocate and apportion such annual local economic increase.

7. **Contract Enforcement.** All grievances arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment or underpayment of wages and/or fringe benefit contributions, failure by the Employer to timely remit dues to the Union, subcontracting in violation hereof, or non-compliance with a binding grievance award. The Employer's violation of any provision of this paragraph will give the Union the right to take any other lawful and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is: in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where no acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all jobs.

8. **Successors.** In the event of any change in the ownership, management or operation of the Employer's business in substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph. The Union may strike to enforce the terms hereof.

9. **Termination.** This Agreement shall remain in full force and effect from June 1, 2001 (unless dated differently below) through May 31, 2006, and shall continue thereafter unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such notice the Employer and the Union agree to be bound by the new area-wide negotiated agreements with the various Associations incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given as provided above.

10. **Execution.** The Employer acknowledges and accepts the facsimile signatures on this contract as if they were the original signatures. The Employer further acknowledges receipt of a copy of the complete Joint Agreements.

Dated: **Aug 16** , 20**02**

ACCEPTED:
Laborers' Local Union No. **6**

**James C. Cusch**

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: **Frank Riley**
Frank Riley, President and Secretary-Treas.

By: **James P. Connolly**
James P. Connolly, Business Manager

For Office Use Only: **CCA #**

**SCIORTINO BROS INC**
(Employer)

FEIN No.: **36-4387801**

By: **Phillip S. Sciortino**

**PHILLIP S. SCIORTINO**
(Print Name and Title)

**PHILLIP S. SCIORTINO**
(Signature)

**4937 W. Foster Ave**
(Address)

**Chicago IL 60630**
(City, State and Zip Code)

**(773) 205-1155** Fax **(773) 205-1151**
(Telephone/Telefax)

WHITE - LOCAL UNION  •  CANARY - TRUST FUND  •  PINK - DISTRICT COUNCIL  •  GOLD - EMPLOYER

RECEIVED SEP 05 2002 FIELD DEPT

EXHIBIT
**A-1**

JUNE 1, 2001 TO MAY 31, 2006

# CONCRETE AGREEMENT

between the

CONCRETE CONTRACTORS ASSOCIATION
OF GREATER CHICAGO

and the

CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY

1

**NOTES**

EXHIBIT
A-2
tabbies

of a non-signatory subcontractor, or fail to remove the non-signatory subcontractor within 24 hours upon the Union's request, the Employer shall pay to the Union, and its employees on the jobsite, an amount equal to the difference between the subcontractor's aggregate wages and benefits and the amount set forth in this Agreement for the entire period that the subcontractor works with a Union agreement on the job site.

## Article VIII
## WAGES

**Paragraph 1.** The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2001 to and including May 31, 2006, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include an increase of $1.65 per hour effective June 1, 2001 to May 31, 2002 for a wage rate of $26.65 per hour which includes the dues deduction. June 1, 2002 to May 31, 2003, $1.80 per hour increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. June 1, 2003 to May 31, 2004, $2.00 per hour increase to be allocated between wages and fringe benefits by the Union in its sole discretion. June 1, 2004 to May 31, 2005, $2.20 per hour increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. June 1, 2005 to May 31, 2006, $2.20 per hour increase to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion.

| CLASSIFICATION | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 |
|---|---|---|---|---|---|
| Building Laborers | $26.65 | $1.80 | $2.00 | $2.20 | $2.20 |
| Fire BrickWork and Boiler Setter Laborers | 26.975 | to be allocated between wages and fringe benefits by the Union in its sole discretion. | | | |
| Jackhammerman (On Firebrick Work Only) | 27.225 | | | | |
| Boiler Setter Plastic Laborers | 27.10 | (See above paragraph) | | | |

Chimney Laborers (Over 40 Feet) ........ 26.75
Chimney on Firebrick ..... 27.00
Scaffold Laborers ........ 26.75
Caisson Diggers ......... 27.00
Jackhammerman ...... 26.875
Power Driven Concrete Saws, Other Power Equipment ... 26.875
Stone Derrickman and Handlers ..... 26.85
Fireproofing and Fire Shop Laborers ....... 26.55
Well Point System Men ... 27.00
Pumps for Dewatering, other Unclassified Laborers ..... 26.65
Windlass and Capstan Person ..... 26.80
Cement Gun Nozzle Laborers (Gunite) ..... 26.80
Cement Gun Laborers ..... 26.725
Plaster Laborers ..... 26.65
Construction Specialist .... 26.65
Apprentice (1st 6 Months) ..... 15.99
Apprentice (2nd 6 Months) .... 18.655
Apprentice (3rd 6 Months) .... 21.32
Apprentice (4th 6 Months) .... 23.985
Apprentice (5th 6 Months) .... 26.65

Sub-Foremen shall receive $.75 premium wages over and above top Laborers' Scale under his supervision.

Building Labor Foremen shall receive $1.50 premium wages over and above top Laborers' Scale under his supervision.

General Foremen shall receive $2.00 premium wages over and above top Laborers' Scale under his supervision.

Superintendents shall receive $3.00 premium wages over and above top Laborers' Scale under his supervision.

Dosimeter Use: A premium of one ($1.00) dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

Power Pac: When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

Asbestos Use: For the period June 1, 2001 through May 31, 2002, a premium of fifteen cents ($.15) per hour shall be paid to any Laborer required to work with asbestos who is a certified asbestos Laborer licensed by the State of Illinois as an Asbestos Abatement worker. Thereafter, no premium shall be paid.

## Paragraph 2. APPRENTICE PROGRAM

Section 1. APPRENTICE COMMITTEE: The Employer hereby agrees that the Joint Apprenticeship Training Committee (JATC) shall have the authority to establish rules for the apprentice program, including penalties for violations of the apprenticeship rules, which are incorporated herein by reference. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Apprentice and Training Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreement and Declaration of Trust.

Section 2. APPRENTICE PROGRAM FUNDING: The apprenticeship program administered by the JATC shall be self sustaining. In addition to the sums set forth in Article IX, Paragraph 2 of the Agreement, effective January 1, 1999, or on the date when the Association elects to participate in the program, whichever is later, the Employer shall also contribute to the Training Fund an additional contribution of five cents ($.05) per hour for each hour worked by all employees covered by this Agreement, or a lesser amount as may be determined by the JATC. Effective June 1, 1999 and June 1, 2000, or on the

date when the Association elects to participate in the program, whichever is later, the contribution shall be increased as determined by the JATC, but in no event shall the aggregate contributions under this Paragraph 2 exceed five cents ($.05) over the term of this Agreement.

Section 3. The term of apprenticeship shall be 4,000 hours, or two years, whichever occurs later. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

Section 4. The wages per hour paid to apprentices shall be as follows:

1st six (6) months: .. 60% of journeyman (base) wages
2nd six (6) months: .. 70% of journeyman (base) wages
3rd six (6) months: .. 80% of journeyman (base) wages
4th six (6) months: .. 90% of journeyman (base) wages
After 24 months: ... 100% of journeyman (base) wages

Section 5. The ratio of journeymen to apprentices shall be six (6) laborer journeymen to one. (1) laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) laborer journeymen shall be entitled to one (1) laborer apprentice, who may be assigned to job sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

Section 6. Referral of apprentices will be through the Local Union with jurisdiction over the job site. All apprentices must be referred by the Local Union from approved JATC apprentices. Employers requesting apprentices will be assigned an apprentice from the available JATC apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program.

Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be tested for the presence of illegal substances at the time they enter the apprentice program.

**Paragraph 3. WELFARE:** Beginning the period from June 1, 2001 to May 31, 2002, the Employer agrees to make Health and Welfare contributions of $3.45 per hour for each hour worked by all employees covered by this Agreement in addition to the wages herein stipulated. This $3.45 per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2002 to May 31, 2003; June 1, 2003 to May 31, 2004, June 1, 2004 to May 31, 2005, June 1, 2005 to May 31, 2006; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training and other funds to be allocated from the economic package for that year. (See Article VIII, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreements and Declarations of Trust.

**Paragraph 4. PENSION:** Beginning June 1, 2001 the Employer agrees to make a pension contribution of $2.65 per hour for each hour worked by all employees covered by this Agreement in addition to the wages and welfare payments herein stipulated. This $2.65 per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2002 to May 31, 2003; June 1, 2003 to May 31, 2004, June 1, 2004 to May 31, 2005, June 1, 2005 to May 31, 2006; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training and other funds to be allocated from the economic package for that year. (See Article VIII, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto, and agrees to be bound by all actions taken by the Trustees of that fund pursuant to the Agreements and Declarations of Trust.

The parties agree that the Employer shall make lump sum contributions to employee fringe benefit accounts, administered by the Trustees on behalf of each employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during

this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees place the account in the hands of legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees authority to waive any costs shall be governed by the terms of the Trust Agreement.

18

**Paragraph 5. Section 415 Excess Benefit Fund.** A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Paragraph 6. SUPERVISORS:** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 3 and 4 of Article VIII of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 3 and 4 of Article VIII hereof.

**Paragraph 7. OUT OF TOWN WORK:** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are asked to work at locations outside these nine counties, the Employer

19

shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement.

## Article IX
### BONDING

All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a) Formation of Partnerships;

(b) Termination of business;

(c) Change of name commonly used in business operation;

(d) Change in form of business organization;

(e) Incorporation of business;

(f) Dissolution of corporation;

(g) Name and business organization of successor;

(h) Admission to or withdrawal from any association operating as a multi-Employer bargaining unit.

## Article X
### INDUSTRY FUND

**Paragraph 1.** Each Employer shall pay the amount of seven cents ($.07) for each hour worked by those employees covered under this Agreement to the CCA Industry Advancement Fund ("Industry Fund") and shall also pay the amount of six cents ($.06) for each hour worked by those employees covered under this Agreement to the Chicago-area Laborers-Employees Cooperation Education Trust ("LECET") and shall also pay the amount of twelve cents ($.12) for each hour worked by those employees to the Laborers' District Council Labor-Management Cooperation Committee ("LDC/LMCC").

**Paragraph 2.** The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Industry Fund, LECET, and the LDC/LMCC, and all amendments thereto, and agrees to be bound by all actions taken by the Trustees of those funds pursuant to the Agreement and Declaration of Trust of those funds.

**Paragraph 3.** Should any Employer fail to make payments to the Industry Fund, LECET Fund or LDC/LMCC, the Employer shall be liable for and pay, in addition to the delinquent contributions, interest at a rate of ten percent (10%) per year for such delinquencies, and to pay all costs of collection, including audit expenses and attorney fees and costs.

## Article XI
### PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS

**Paragraph 1.** (a) Building Laborers' scale shall apply to all work performed by the Laborers except as specifically classified.

(b) Boiler Setter Laborers will include all work of handling solid refractory materials and also fire brick work in boiler setting, open hearth, furnace, blast fur-

nace, soaking pits, tanks, dust catchers, coke oven batteries, furnace chimneys and stacks, including cleanup work on the above services.

(c) Boiler Setter Plastic Laborers applies to work of actually installing plastic, in connection with the boiler work or other non-solid refractory materials. Mortar mixers, lancers, burners, etc., plus all work from point of forty (40) feet above normal ground level in fire brick work and Boiler Setters Laborers' Classifications.

Minimum safety measures for Boiler Setters are that all scaffolding, in and around blast furnaces and hot stoves, etc., shall not exceed five (5) feet per landing and be constructed of solid-type materials, except the large cable-type used in blast furnaces, and at least every fourth scaffold shall be left in place to serve as a safety scaffold with ladders extending to safe distance above each landing. The Employer shall furnish respirators, safety goggles, gloves and other protection materials necessary in and about dusty and hot working conditions during all furnace work.

(d) Caisson Diggers applies to all caisson work and men working in trenches, foundation pits and piers eight (8) feet or more in depth below the level that excavation begins in such trenches, foundation pits or piers.

Where hazardous conditions exists when excavating trenches, foundation pits or piers or where a type of soil, sand or other material being removed creates a hazardous condition for the employee such trenches, foundation pits or piers must be shored or sheathed, and the employees performing the work of shoring and sheathing shall be paid the caisson rate.

Where hazardous conditions do not exist, but sheathing or shoring is necessary solely for the purpose of protecting a bank or preserving the work, then caissons rates shall not apply.

When specifications show the depth of such excavation to exceed eight (8) feet, said caisson rate shall apply

from the start of excavation when hand dug. For safety reasons, no worker shall be permitted to work alone if excavation exceeds five (5) feet, unless he is working under direct supervision.

(e) Chimney Laborers ,over forty (40) feet, applies to all free-standing chimneys in excess of forty (40) feet above the ground level. The Chimney Laborers' rate shall apply for the entire height of the chimney, both erecting or wrecking such chimney.

Free-standing chimneys shall be construed as chimneys built from the ground up, outside the building, for industrial, commercial or institutional purposes. It is understood that this provision does not apply in the erection of ordinary chimneys for apartment buildings, etc., unless the chimneys go forty (40) feet above the roof level.

(f) Jackhammermen: The rate for Jackhammermen herein established shall apply to any mechanically operated tool over thirty-five (35) pounds in weight, used in demolition, concrete breaking, tamping or other similar work. The regular building Laborers' rate shall apply to all lighter mechanical tools.

(g) Scaffold Laborers: Applies to all Laborers engaged in installing, relocating and/or removing all swinging, tubular and other types of scaffolds designed and used for tending to or servicing our allied trades. The raising and lowering of swinging and specially designed scaffolds by hand, by power, or by any other process, is not included in scaffold Laborers' rates.

(h) Stone Derrickmen and Handlers: Applies to all Laborers engaged in helping the stone setters set and distribute dimensional cut stone, terra cotta, granite or prefabricated materials replacing or substituted for cut stone, etc.

(i) Windlass and Capstan Persons: Applies to all hoisting units attached to mixers or movable equipment used to raise material where regular hoists cannot be erected or used.

multiple of eight (8) Laborers employed thereafter to properly supervise the various phases of the work. A Sub-Foreman shall receive $.75 premium wages above the regular wages paid those Laborers under his supervision, plus established overtime rates. When a Labor Foreman is needed to supervise Laborers such Labor Foreman shall receive $1.50 or more premium wages above top labor scale, as mutually agreed between said Labor Foreman and his Employer.

The above and foregoing shall not be so construed as to restrict the Employer's right to pay higher premium wages or appoint a greater percentage of foremen and/or sub-foremen.

(r) The Employer shall furnish any necessary protective medication, such as petroleum jelly, to prevent burns from creosote or chemicals which may prove injurious to the skin.

(s) On a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if Employer determines tending is required.

(t) Portable Water Pumps shall be tended by Laborers if Employer determines tending is required.

(u) In any instance where a machine replaces only the work of Laborers, said machine shall be operated by a Laborer if so determined by the Employer.

(v) Any building 125 feet high or more shall require the use of a Man Cage.

**Paragraph 2.** Wages shall be paid by payroll check, which will include a stub or statement showing the number of hours worked and all deductions from wages. Failure on the part of the Employer to have sufficient funds in the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks and Joint Arbitration Board shall assess such Employer a sum equal to not less than the expense

(j) Fireproofing and Fire Shop Laborers: applies to fireproofing beams, ceilings and walls, etc., in connection with gunite work, or any other process, including clean-up work on job site, shops or yards.

(k) Cement Gun Nozzle Laborers: (Gunite) Applies to Laborers handling nozzle in application of gunite.

(l) Cement Gun Laborers: Applies to laborers handling cement gun on concrete work.

(m) Plasterer Laborers: Applies to all Laborers as agreed upon in the Agreement with the Chicagoland Association of Wall and Ceiling Contractors, and Construction and General Laborers' District Council of Chicago and Vicinity.

(n) Laborers who are engaged in the work of construction or wrecking of silos, etc., for grain elevators, and are required to strip or wreck forms as hazardous heights in this work shall be paid chimney Laborers' rates.

(o) On salamander work or hearing for frost prevention work, the building Laborers' rates of wages shall apply for the first eight (8) hours' work regardless of starting time Monday through Friday of each week. All hours worked on Saturday, Sunday or Holidays, and all hours worked after eight (8) hours per day, or forty (40) hours per week Monday through Friday, as above set forth, shall be paid for at one and one-half times the Building Laborers' rate of wages.

(p) Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

(q) Foremen: There shall be a Laborer appointed as Labor Foreman when eight (8) or more Laborers are employed on any one job or project; there shall be a sub-foreman after the first sixteen (16) Laborers, and for each

incurred in the collection of the amounts due because of such insufficient funds to meet checks so issued.

**Paragraph 3.** The Union agrees that the employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the Employer agrees to pay the wages and fringe benefit payments herein stipulated.

**Claims for Shortages:** Claims by employees for shortages must be made within three (3) weeks after shortage is discovered.

**Paragraph 4.** Payment by the Employer and acceptance by the employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Arbitration Board of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay the Joint Arbitration Board an amount equal to the penalties provided in the appropriate Article of General Conditions of this Agreement, but under no circumstances shall such penalties be less than fifty (50%) percent of the amount of such pay shortage as just and liquidated damages because of such violation.

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to the employment of its members.

Members of the party of the second part who are found guilty of violation of this Agreement shall be dealt with by the party of the first part.

**Paragraph 5.** The Union reserves and shall have the right to remove its men from any job upon the failure of the Employer to pay the wages due any of its employees or fringe benefits which may be due by reason of the hours of employment.

**Paragraph 6.** The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all employees on the job.

**Paragraph 7.** The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

**Paragraph 8. HIRING HALL:** No agreement on the request of the Union for the establishment of an exclusive Hiring Hall has been consummated. Therefore, the question of establishing a Hiring Hall is hereby reserved for the future consideration of the parties. Upon service of sixty (60) days' notice in writing upon Employer from Union, such question shall be taken up for discussion and further negotiation by the parties hereto.

## Article XII
## STEWARDS

**Paragraph 1.** The Business Agent of the Union in whose jurisdiction a job or project is located shall have the right to appoint one Laborer employed on the job as Steward on said job or project. Such Steward shall be subject to the same terms of employment as any other employee, but taking into consideration that the Steward should be present during all working hours, all possible overtime work shall be assigned to all Stewards, if the Stewards do not replace another Laborer from that other Laborers' previously assigned duties.

**Paragraph 2.** The duties of the Steward shall include the checking of terms and conditions of work, safety conditions, starting dates of employment for new Laborers, whether Union or Non-Union, and report same to the Business Representative who appointed him. All Laborers employed on a job or project shall report to the Steward any differences or disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union. If it becomes necessary to discharge or lay off any Laborers because of completion of the work or otherwise, the Laborer

# RESTATED AGREEMENT

### AND

# DECLARATION OF TRUST

### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002


EXHIBIT
A-3

(b)    To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)    To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

**Section I.**    **IN GENERAL.**  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work. No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.  FILING OF A CLAIM.  Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

# ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.       .

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers.** New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers.** Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*


* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

Restated through
July 1, 2003



1

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the time required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

# ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# RICHARD J. WOLF AND COMPANY, INC.

Post Office Box 591
Palos Park, Illinois 60464
(708) 923-0909
Fax (708) 923-0910

 433

July 19, 2004

Board of Trustees of the Various
Fringe Benefit Funds of the
Laborers Pension & Welfare Funds

RE: Sciortino Bros. Inc. (25254)

We have performed a fringe benefit contribution compliance audit of Sciortino Bros. Inc., for the period from August 16, 2002 through May 31, 2004. The audit encompassed a review of the check stubs.

Because the employer did not provide us with payroll an d payroll tax records, we were unable to determine the extent of the employer's fringe benefit contribution compliance.

However, based only on the limited records provided, we were able to determine that the employer has not complied with its fringe benefit contribution requirements and owe the following amounts:

| FUND | AMOUNT |
|------|--------|
| WELFARE | $ 23,100.83 |
| PENSION | 18,854.96 |
| TRAINING | 987.80 |
| CCA/IAF | 406.75 |
| LECET | 348.63 |
| LMDCL | 697.26 |
| DUES | 2,637.11 |
| TOTAL | $ 47,033.34 |

In addition, the employer could not provide proof of a current wage and fringe benefit bond.

RICHARD J. WOLF AND COMPANY, INC.

EXHIBIT
A-5

# LABORERS' DISTRICT COUNCIL OF CHICAGO - CCA ASSOCIATION
## SCIORTINO BROS. INC. #24454
### UNREPORTED HOURS and/or WORK DUES  6/02 - 5/03

JUN 02 to MAY 03

|  |  |  | 2002 |  |  |  |  |  |  | 2003 |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S. S. # | Flags | Type | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
| BRATUS, MATRON | CHS 29.00 | Hours | - | - | 47.00 | - | - | - | - | - | - | - | - | - | 47.00 |
|  |  | Gross $ | - | - | 702.00 | - | - | - | - | - | - | - | - | - | $ 702.00 |
| BULLOCK JAMES | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | 21.00 | - | - | 21.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | 588.00 | - | - | $ 588.00 |
| COLLEUM, ALMOS | CHS 29.00 | Hours | - | - | 67.00 | - | 18.00 | - | - | - | - | - | - | - | 85.00 |
|  |  | Gross $ | - | - | 1,000.00 | - | 500.00 | - | - | - | - | - | - | - | $ 1,500.00 |
| DRIVER, NELSON | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | 21.00 | 16.00 | - | 37.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | 595.00 | 450.00 | - | $ 1,045.00 |
| HOMA, ODESHO | CHS 29.00 | Hours | - | - | 294.00 | - | 36.00 | - | - | - | - | - | - | - | 330.00 |
|  |  | Gross $ | - | - | 4,400.00 | - | 1,000.00 | - | - | - | - | - | - | - | $ 5,400.00 |
| KULCHYTSKY, YEVHEN | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | 14.00 | - | 14.00 |
|  |  | Gross $ | - | - | 2,600.00 | - | - | - | - | - | - | - | - | - | $ 2,600.00 |
| KUNITZ, IVAN | CHS 29.00 | Hours | - | - | 213.00 | - | - | - | - | - | - | 14.00 | 20.00 | - | 247.00 |
|  |  | Gross $ | - | - | 3,195.00 | - | - | - | - | - | - | 400.00 | 570.00 | - | $ 4,166.00 |
| NAVA, MIGUEL | CHS 29.00 | Hours | - | - | 52.00 | - | - | - | - | - | - | - | - | - | 52.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | 390.00 | - | $ 390.00 |
| PEARSON, CARL | CHS 29.00 | Hours | - | - | 173.00 | - | - | - | - | - | - | - | - | - | 173.00 |
|  |  | Gross $ | - | - | 775.00 | - | - | - | - | - | - | - | - | - | $ 775.00 |
| PEREZ, GUADALUPE | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | 21.00 | - | - | 21.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | 595.00 | - | - | $ 595.00 |
| RUSH, CHARLES | CHS 29.00 | Hours | - | - | 200.00 | - | - | - | - | - | - | - | - | - | 200.00 |
|  |  | Gross $ | - | - | 3,000.00 | - | - | - | - | - | - | - | - | - | $ 3,000.00 |
| SIWEK, STEVEN | 29.00 | Hours | - | - | 200.00 | - | 488.50 | - | - | - | - | - | - | - | 686.50 |
|  |  | Gross $ | - | - | 3,000.00 | - | 13,610.00 | - | - | - | - | - | - | - | $ 16,610.00 |
| TOTAL HOURS |  |  | - | - | 1,246.00 | - | 540.50 | - | - | - | - | 77.00 | 50.00 | - | 1,913.50 |
| TOTAL GROSS $ |  |  | $ - | $ - | $ 18,672.00 | $ - | $ 15,110.00 | $ - | $ - | $ - | $ - | $ 2,178.00 | $ 1,410.00 | $ - | $ 37,370.00 |

# LABORERS' DISTRICT COUNCIL OF CHICAGO - "CCA ASSOCIATION"

## SCIORTINO BROS. INC. #24254

## UNREPORTED HOURS and/or WORK DUES  6/02 - 5/03

**JUN 02 to MAY 03**

| Amount Due To Funds: | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WELFARE | $ - | $ - | $ 4,460.68 | $ - | $ 1,934.99 | $ - | $ - | $ - | $ - | $ 275.66 | $ 179.00 | $ - | $ 6,850.33 |
| PENSION | $ - | $ - | $ 3,700.62 | $ - | $ 1,665.28 | $ - | $ - | $ - | $ - | $ 228.69 | $ 148.50 | $ - | $ 5,683.10 |
| TRAINING | $ - | $ - | $ 211.82 | $ - | $ 81.89 | $ - | $ - | $ - | $ - | $ 13.09 | $ 8.50 | $ - | $ 325.30 |
| CCA/IAF | $ - | $ - | $ 87.22 | $ - | $ 37.84 | $ - | $ - | $ - | $ - | $ 5.39 | $ 3.50 | $ - | $ 133.95 |
| LECET | $ - | $ - | $ 74.76 | $ - | $ 32.43 | $ - | $ - | $ - | $ - | $ 4.62 | $ 3.00 | $ - | $ 114.81 |
| LMDCL | $ - | $ - | $ 149.52 | $ - | $ 64.86 | $ - | $ - | $ - | $ - | $ 9.24 | $ 6.00 | $ - | $ 229.62 |
| DUES | $ - | $ - | $ 326.76 | $ - | $ 264.43 | $ - | $ - | $ - | $ - | $ 38.12 | $ 24.68 | $ - | $ 653.99 |
| TOTAL | $ - | $ - | $ 9,011.38 | $ - | $ 4,031.73 | $ - | $ - | $ - | $ - | $ 574.81 | $ 373.18 | $ - | $ 13,991.10 |

| Rates: | 6/1/02 | to | 5/31/03 |
|---|---|---|---|
| WELFARE | 3.58 | LECET | 0.06 |
| PENSION | 2.97 | LMDCL | 0.12 |
| TRAINING | 0.17 | DUES | 1.75% |
| CCA/IAF | 0.07 | | |

JUN 03 to MAY 04

**LABORERS' DISTRICT COUNCIL OF CHICAGO - *CCA ASSOCIATION**

**SCIORTINO BROS. INC. #24254**

**UNREPORTED HOURS and/or WORK DUES 6/03 - 5/04**

| S.S.# | Name | Flags | Type | 2003 Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2004 Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▬▬▬ | AGUILAR, MARCO | CHS 29.00 | Hours | | | | | | | | | | | 116.00 | 62.00 | 178.00 |
| | | | Gross $ | | | | | | | | | | | 3,365.10 | 1,784.64 | $ 5,149.74 |
| ▬▬▬ | ALEXANDER, KEITH | CHS 28.00 | Hours | | | | | | | | | | | | 122.00 | 122.00 |
| | | | Gross $ | | | | | | | | | | | | 3,527.70 | $ 3,527.70 |
| ▬▬▬ | BESERRA, PABLINO | CHS 29.00 | Hours | | | | | | | | | | 100.00 | 44.00 | | 144.00 |
| | | | Gross $ | | | | | | | | | | 2,891.02 | 1,268.57 | | $ 4,159.59 |
| ▬▬▬ | BLONDELL, REID | CHS 29.00 | Hours | | | | | | | | | | | 32.50 | 90.50 | 123.00 |
| | | | Gross $ | | | | | | | | | | | 1,108.97 | 2,830.12 | $ 3,939.09 |
| ▬▬▬ | BRESEMAN, JAMES | CHS 29.00 | Hours | | | | | | | | | | | 212.50 | 209.00 | 421.50 |
| | | | Gross $ | | | | | | | | | | | 6,188.90 | 6,029.22 | $ 12,218.12 |
| ▬▬▬ | CARMICKLE, DANIEL | CHS 29.00 | Hours | | | | | | | | | | | 31.00 | | 31.00 |
| | | | Gross $ | | | | | | | | | | | 910.44 | | $ 910.44 |
| ▬▬▬ | COLA, KARL | CHS 29.00 | Hours | | | | | | | | | | 19.00 | 30.00 | | 49.00 |
| | | | Gross $ | | | | | | | | | | 545.86 | 864.55 | | $ 1,410.41 |
| ▬▬▬ | COLLEUM, ALMOS | CHS 29.00 | Hours | | 22.00 | | | | | | | | | | | 22.00 |
| | | | Gross $ | | 630.00 | | | | | | | | | | | $ 630.00 |
| ▬▬▬ | GUTIERREZ, JOSE | CHS 29.00 | Hours | | | | | | | | | 20.00 | 53.00 | | | 73.00 |
| | | | Gross $ | | | | | | | | | 585.00 | 1,537.83 | | | $ 2,122.83 |
| ▬▬▬ | HOMA, ODESHO | CHS 29.00 | Hours | 48.00 | 27.00 | | | | | 7.00 | | | | 47.00 | 29.00 | 158.00 |
| | | | Gross $ | 1,400.00 | 776.03 | | | | | 200.00 | | | | 1,363.89 | 814.10 | $ 4,554.02 |
| ▬▬▬ | JACINTO, ROSALIO | CHS 29.00 | Hours | | | | | | | | | | | | 181.50 | 181.50 |
| | | | Gross $ | | | | | | | | | | | | 5,264.74 | $ 5,264.74 |
| ▬▬▬ | JULIANO, LAWRENCE | CHS 29.00 | Hours | | 17.00 | | | | | | | | | | 34.00 | 51.00 |
| | | | Gross $ | | 500.00 | | | | | | | | | | 1,000.00 | $ 1,500.00 |
| ▬▬▬ | KULCHYTSKY, YEVHEN | CHS 29.00 | Hours | 29.00 | | | | | | | | 24.00 | 91.00 | 160.50 | 116.00 | 420.50 |
| | | | Gross $ | 810.00 | | | | | | | | 697.45 | 2,662.85 | 4,657.76 | 3,385.07 | $ 12,213.13 |
| ▬▬▬ | KUNTZ, IVAN | CHS 29.00 | Hours | 40.00 | 24.00 | | | | | 138.00 | | 13.00 | 78.00 | 87.50 | 211.50 | 592.00 |
| | | | Gross $ | 1,149.31 | 697.45 | | | | | 4,002.00 | | 375.00 | 2,249.21 | 2,541.16 | 6,131.53 | $ 17,145.65 |
| ▬▬▬ | LUTTRELL, ROBERT | CHS 29.00 | Hours | | | | | | | | | | | 9.00 | | 9.00 |
| | | | Gross $ | | | | | | | | | | | 271.19 | | $ 271.19 |
| ▬▬▬ | MARTINEZ, MARIA | CHS 29.00 | Hours | | | | | | | | | | | 34.00 | 117.00 | 151.00 |
| | | | Gross $ | | | | | | | | | | | 983.10 | 3,391.48 | $ 4,374.58 |

# LABORERS' DISTRICT COUNCIL OF CHICAGO - 'CCA ASSOCIATION

## SCIORTINO BROS, INC. #24254

### UNREPORTED HOURS and/or WORK DUES 6/03 - 5/04

JUN 03 to MAY 04

| S.S.# | Flags | Type | 2003 Jun | Jul | Aug | Sep | Oct | Nov | Dec | 2004 Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| McEVOY, JAMES | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | 134.00 | 101.00 | 235.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | 3,874.00 | 2,929.00 | 6,803.00 |
| HICHOLL, ROBERT | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | - | 23.00 | 23.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | - | 661.05 | 661.05 |
| NICHOLS, JASON | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | 104.00 | 132.00 | 236.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | 3,017.36 | 3,838.01 | 6,855.37 |
| NOMAN, EDGAR | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | 23.00 | - | - | - | 23.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | 666.00 | - | - | - | 666.00 |
| PEREZ, SILVESTRE | CHS 29.00 | Hours | - | 28.00 | - | - | - | - | - | - | - | - | - | - | 28.00 |
|  |  | Gross $ | - | 800.00 | - | - | - | - | - | - | - | - | - | - | 800.00 |
| POTTHOF, THOMAS | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | - | 17.00 | 17.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | - | 498.35 | 498.35 |
| RODRIGUEZ, LAZANO | CHS 29.00 | Hours | 21.00 | 21.00 | - | - | - | - | - | - | - | - | - | - | 42.00 |
|  |  | Gross $ | 600.00 | 600.00 | - | - | - | - | - | - | - | - | - | - | 1,200.00 |
| RODRIGUEZ, RAMON | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | 52.00 | - | - | 52.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | 1,500.00 | - | - | 1,500.00 |
| TIDWEL, ANDRE | CHS 29.00 | Hours | - | 32.00 | - | - | - | - | - | - | - | - | - | - | 32.00 |
|  |  | Gross $ | - | 910.00 | - | - | - | - | - | - | - | - | - | - | 910.00 |
| UGALDE, FIDEL | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | - | 236.50 | 236.50 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | - | 6,856.98 | 6,856.98 |
| URIOSTEGUI, EMILIO | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | 19.00 | 96.00 | 67.00 | - | 182.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | 540.00 | 2,806.47 | 1,943.22 | - | 5,289.69 |
| VILLACORTA, JORGE | CHS 29.00 | Hours | - | - | - | - | - | - | - | - | - | - | 56.00 | 8.00 | 64.00 |
|  |  | Gross $ | - | - | - | - | - | - | - | - | - | - | 1,616.82 | 232.00 | 1,848.82 |
| **TOTAL HOURS** |  |  | 138.00 | 171.00 | - | - | - | - | 145.00 | - | 99.00 | 521.50 | 1,223.00 | 1,569.50 | 3,897.00 |
| **TOTAL GROSS $** |  |  | 3,989.31 | 4,913.48 | - | - | - | - | 4,202.00 | - | 2,863.45 | 16,292.31 | 35,696.17 | 46,383.77 | 113,320.49 |

JUN 03 to MAY 04

| S. S. # | Flags | Type | 2003 Jun | Jun Jul | Jul Aug | Aug Sep | Sep Oct | Oct Nov | Nov Dec | Dec 2004 Jan | Jan Feb | Feb Mar | Mar Apr | Apr May | May Total | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Amount Due To Funds:**

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WELFARE | $ 575.46 | $ 713.07 | $ - | $ - | $ - | $ - | $ 604.66 | $ - | $ 412.83 | $ 2,174.66 | $ 5,069.91 | $ 6,669.92 | $ 16,260.50 |
| PENSION | $ 466.44 | $ 577.98 | $ - | $ - | $ - | $ - | $ 490.10 | $ - | $ 334.62 | $ 1,762.67 | $ 4,133.74 | $ 5,408.31 | $ 13,171.86 |
| TRAINING | $ 23.46 | $ 29.07 | $ - | $ - | $ - | $ - | $ 24.65 | $ - | $ 16.83 | $ 88.66 | $ 207.91 | $ 271.92 | $ 662.50 |
| CCA/IAF | $ 9.66 | $ 11.97 | $ - | $ - | $ - | $ - | $ 10.15 | $ - | $ 6.93 | $ 36.51 | $ 85.61 | $ 111.97 | $ 272.80 |
| LECET | $ 8.28 | $ 10.26 | $ - | $ - | $ - | $ - | $ 8.70 | $ - | $ 5.94 | $ 31.29 | $ 73.38 | $ 95.97 | $ 233.82 |
| LMDCL | $ 16.56 | $ 20.52 | $ - | $ - | $ - | $ - | $ 17.40 | $ - | $ 11.88 | $ 62.58 | $ 146.76 | $ 191.94 | $ 467.64 |
| DUES | $ 69.81 | $ 85.99 | $ - | $ - | $ - | $ - | $ 73.54 | $ - | $ 50.11 | $ 267.62 | $ 624.08 | $ 811.37 | $ 1,983.12 |
| TOTAL | $ 1,169.67 | $ 1,448.86 | $ - | $ - | $ - | $ - | $ 1,229.19 | $ - | $ 839.14 | $ 4,423.99 | $ 10,371.99 | $ 13,559.40 | $ 33,042.24 |

Rates:  6/1/03 to 5/31/04

| | | | |
|---|---|---|---|
| WELFARE | 4.17 | LECET | 0.06 |
| PENSION | 3.38 | LMDCL | 0.12 |
| TRAINING | 0.17 | DUES | 1.75% |
| CCA/IAF | 0.07 | | |

# LABORERS' DISTRICT COUNCIL OF CHICAGO - *CCA ASSOCIATION

## SCIORTINO BROS. INC.  #24254

### RICHARD J. WOLF AND COMPANY, INC.

## SUMMARY REPORT TOTAL

| | ADDITIONAL | UNREPORTED | TOTAL |
|---|---|---|---|
| WELFARE | $ - | $ 23,100.83 | $ 23,100.83 |
| PENSION | $ - | $ 18,854.96 | $ 18,854.96 |
| TRAINING | $ - | $ 987.80 | $ 987.80 |
| CCA/IAF | $ - | $ 406.75 | $ 406.75 |
| LECET | $ - | $ 348.63 | $ 348.63 |
| LMDCL | $ - | $ 697.26 | $ 697.26 |
| DUES | $ - | $ 2,637.11 | $ 2,637.11 |
| TOTAL | $ - | $ 47,033.34 | $ 47,033.34 |

# LABORERS' DISTRICT COUNCIL OF CHICAGO - *CCA ASSOCIATION

## SCIORTINO BROS. INC.  #24254

### RICHARD J. WOLF AND COMPANY, INC.

#### ** GRAND TOTAL **

| | | |
|---|---|---|
| WELFARE | $ | 23,100.83 |
| PENSION | $ | 18,854.96 |
| TRAINING | $ | 987.80 |
| CCA/IAF | $ | 406.75 |
| LECET | $ | 348.63 |
| LMDCL. | $ | 697.26 |
| DUES | $ | 2,637.11 |
| TOTAL | $ | 47,033.34 |